IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE  DIVISION

| | | |
|---|---|---|
| American Humanist Association, | ) | |
| John Doe and Jane Doe *as parents* | ) | Case No.  6:13-cv-02471-BHH |
| *and next friends of their minor child*, | ) | |
| and Jill Doe, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| South Carolina Department of Education | ) | |
| and Greenville County School District, | ) | |
| | ) | |
| Defendants.[1] | ) | |
| _____ | ) | |

This matter is before the Court on Plaintiffs' motion for preliminary injunction.  [Doc.
5.]  Pursuant to the provisions of 28 U.S.C. § 636, Local Civil Rule 73.02(B)(1), D.S.C., and
the Order of reference from the Honorable Bruce Howe Hendricks dated August 21, 2014
[Doc. 77], this Magistrate Judge is authorized to review this pre-trial motion and submit
findings and a recommendation to the District Court.

Plaintiffs initially filed their Complaint in this action on September 11, 2013 [Doc. 1],
and filed a motion for preliminary injunction on September 16, 2013 [Doc. 5].  Following the
Honorable G. Ross Anderson's denial of the motion for injunction on December 3, 2013
[Doc. 26], Plaintiffs filed an interlocutory appeal with the Fourth Circuit Court of Appeals
on December 12, 2013 [Doc. 29].  The case was remanded to the District Court of South
Carolina by order dated May 16, 2014.  [Doc. 51.]  The Court order supplemental briefing
on June 21, 2014.  [Doc. 56.]  This motion was subsequently referred to the undersigned

---

[1] Burke Royster, Jr. and Jennifer Gibson were also named as defendants in the
Complaint, but they were dismissed with prejudice pursuant to a Stipulation of Dismissal
filed on December 13, 2013.  [Doc. 30.]

on August 21, 2014 for a Report and Recommendation. [Doc. 77.]  The motion is now ripe

for review.

## BACKGROUND

The American Humanist Association ("AHA"),[2] Jill Doe, and her parents John and

Jane Doe (collectively, "Plaintiffs") bring this action "[s]eeking to protect and vindicate their

civil liberties and constitutional rights, including the constitutional mandate of separation

of church and state . . . ." [Doc. 1 at 1.]  Plaintiffs assert that Mountain View Elementary

School (the "Elementary School") started holding its fifth grade graduations at North

Greenville University (the "Christian University") in the Turner Chapel, a place of worship

that includes a Christian cross on the podium and stained glass windows depicting religious

imagery that were visible to the students and other attendees, in 2012.[3]  [Docs. 56 at 10;

1 ¶¶ 24–29.]  They contend that Jill Doe attended the Elementary School and graduated

from fifth grade on May 30, 2013 in a ceremony at the Turner Chapel. [Doc. 1 ¶¶ 6, 24.]

Plaintiffs allege the official written program for the graduation provided for the delivery of

two separate Christian prayers that were, in fact, delivered during the ceremony.  [*Id.* ¶¶

38, 41, 47.]  Students were asked to write the prayers, and each prayer was reviewed and

approved by a teacher or other school employee prior to graduation.   [*Id.* at ¶¶ 52–54.]

---

[2]AHA is a nonprofit 501(c)(3) organization incorporated in Illinois with a principal place of business at 1777 T Street N.W., Washington, D.C.  AHA is a membership organization with over 175 chapters and affiliates nationwide and over 20,000 members, including parents in the Greenville County School District.  AHA promotes humanism and is dedicated to advancing and preserving separation of church and state and the constitutional rights of humanists, atheists, and other freethinkers.  [Doc. 1 ¶ 5.]

[3] The Elementary School is the only elementary or middle school in the Greenville County School District that uses a venue other than the school for its graduation ceremony. [Doc. 56 at 13.]

The Complaint alleges Jill Doe "has been subjected to her Elementary School affiliating itself with, preferring and promoting religion and Christianity specifically" as a result of the Elementary School's decision to hold fifth grade graduation ceremonies in the Turner Chapel and including Christian prayers as part of the official graduation ceremonies. [*Id.* ¶¶ 1, 7.]  Plaintiffs further assert that John and Jane Doe felt their daughter was "coerced into participating in the school-sponsored religious activity" and that the school was pressuring Jill Doe to "believe in God and to adopt Christianity." [*Id.* ¶¶ 8–9.]  The parents of Jill Doe also allege they have other children who will attend public school and will attend a fifth grade graduation ceremony in the Greenville County School District (the "School District"). [*Id.* ¶ 10.]

On June 10, 2013, AHA sent a letter to the School District informing it that its policy and practice of promoting and sponsoring sectarian graduation ceremonies was unconstitutional. [*Id.* ¶ 55.]  On June 17, 2013, AHA sent a second letter to the School District seeking clarification on whether prayers would be included as part of future graduation ceremonies and other school-sponsored events. [*Id.* ¶¶ 60–61.]  On June 25, 2013, the School District responded and indicated that it would continue to allow sectarian prayers to be offered as part of its elementary school graduation ceremonies and would not discontinue using the Turner Chapel as the venue for its events. [*Id.* ¶¶ 62–63.]

Based on the above allegations, Plaintiffs seek

      i.    a declaratory judgment that Defendants' promotion and endorsement of and affiliation with the sectarian prayers included as part of School District graduation ceremonies violates the Establishment Clause of the First Amendment of the United States Constitution and

is a violation of the Plaintiffs' constitutional rights under 42 U.S.C. § 1983;

ii.    a declaratory judgment that Defendants' policy of holding school-sponsored events, including graduation ceremonies, in sectarian venues, such as the [Turner] Chapel, violates the Establishment Clause of the First Amendment of the United States Constitution and is a violation of the Plaintiffs' constitutional rights under 42 U.S.C. § 1983; [and]

iii.    A permanent injunction enjoining the Defendants, their successor, and any person in active concert with the Defendants from knowingly, intentionally, or negligently allowing: (i) prayers to be delivered as part of any school-sponsored event, including but not limited to graduation ceremonies; and (ii) school-sponsored events, including graduations, to be held in churches, chapels and other places of worship or similar religious venues, including but not limited to the [Turner] Chapel or other locations on the campus of the Christian University or any other sectarian institution.

[*Id*. ¶ 70.]  Plaintiffs also seek damages from the School District, including reasonable costs, disbursements, and attorneys' fees as allowed pursuant to 42 U.S.C. § 1988.  [*Id*.]

## APPLICABLE LAW

A preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003).  It is "an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Coucil, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008) (citing *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)).  To obtain a preliminary injunction (or TRO), a plaintiff must show four elements:

1)    he is likely to succeed on the merits,

4

2)    he will suffer irreparable harm if the preliminary (or TRO) injunction is not granted,

3)    the balance of equities favors him, and

4)    the injunction or TRO is in the public interest.

*Winter*, 129 S. Ct. at 374; *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) ("The standard for granting either a TRO or a preliminary injunction is the same."); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–47 (4th Cir. 2009) (explaining how the *Winter* standard for preliminary injunctions was different from the standard previously applied in the Fourth Circuit), *judgment vacated and remanded*, 130 S. Ct. 2371 (2010), *in light of Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010).  The plaintiff must establish all four elements to receive injunctive relief.  *Winter*, 129 S. Ct. at 374.

The Fourth Circuit explained the Supreme Court in *Winter* requires "that the plaintiff make a clear showing that it will likely succeed on the merits at trial."  *Real Truth About Obama, Inc.*, 575 F.3d at 346 (citing *Winter*, 129 S. Ct. at 374, 376).  Moreover, the party seeking the injunction must make a clear showing that it will likely suffer irreparable harm without an injunction.  *Id.* at 347 (citing *Winter*, 129 S. Ct. at 374–76).  Further, the Supreme Court in *Winter* emphasized the public interest requirement, *id.*, requiring courts to "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" *Winter*, 129 S. Ct. at 376–77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

5

## **DISCUSSION**

Plaintiffs seek a preliminary injunction prohibiting the Defendants from holding graduation ceremonies or other school events in religious venues, including the Turner Chapel, and prohibiting any prayers or proselytizing religious messages at graduation ceremonies and other school-sponsored events.[4]  [Doc. 5-1 at 34–35.]  Plaintiffs allege a preliminary injunction is warranted in this case because they can show all of the *Winter* elements.  [*Id*. at 3–6.]  Plaintiffs contend their claims are not moot because Jill Doe is in the seventh grade at a School District school in the 2014–15 school year, her brother is in the fifth grade at the Elementary School for the 2014–15 school year, and another brother is in the third grade at the Elementary School for the 2014–15 school year.  [Doc. 56 at 7.]  Further, Plaintiffs contend that "[t]he School District's policy of including prayers in public school graduation ceremonies extends far beyond [the Elementary School]" to include Woodmont High School, The Washington Center, Palmetto High School, Wren High School, Hillcrest High School, Wade Hampton High School, J.L. Mann High School, and Eastside High School. [Docs. 56-2–56-9.]

Defendants contend Plaintiffs cannot establish the *Winter* elements for injunctive relief.  [Doc. 17 at 4.]  Defendants further contend Plaintiffs' claims for injunctive and

---

[4]Defendants have conceded the validity of Plaintiffs' claim with respect the inclusion of prayer in the graduation ceremony [Doc. 17 at 14] and have "revised the program for the 2014 graduation to eliminate any school-sponsored or endorsed invocations, prayers or benedictions [and have indicated that] [s]tudents will be chosen based upon academic and/or citizenship criteria to give messages of their own choosing without prior review, censorship, or editing by an teacher or administrator at the school" [Doc. 17-1 ¶ 17]. Plaintiffs contend that, although Defendants concede the Prayer Policy is unconstitutional, their new policy still permits the delivery of sectarian prayers.  [Doc. 21 at 7.]  Plaintiffs contention, however, is merely speculative and does not create a constitutional violation. Accordingly, the Court will not address this issue.

declaratory relief are moot because "Jill Doe has presumably moved on to sixth grade and any injury resulting from her alleged exposure to two short student-led prayers and a ceremony at the Turner Chapel have already occurred and cannot be remedied through injunctive relief." [*Id.* at 5.] Further, Defendants contend John and Jane Doe's claims, as well as AHA's claims, are completely derivative of Jill Doe's claim and are also moot. [*Id.*] As discussed below the Court finds Plaintiffs have standing to bring this action and the issue presented is not moot; however, the Court finds Plaintiffs have failed to establish that they are entitled to injunctive relief under *Winter*.

**Standing**

Defendants argue that Plaintiffs have no standing to challenge practices at other schools in the School District that would have "no potential to injure them." [Doc. 17 at 19.] Plaintiffs contend they have standing because the Elementary Schools's graduation will affect John and Jane Doe's other children. [Doc. 21 at 2.] The Court agrees that Plaintiffs have standing to bring this action.

The burden to establish standing rests with the party invoking federal court jurisdiction. *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008). Whether a party has standing hinges upon the facts at the inception of litigation. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000) ("[W]e have an obligation to assure ourselves that [the plaintiff] had Article III standing at the outset of litigation."). The invoking party bears "the burden of showing standing by establishing, inter alia, that they have suffered an injury in fact, i.e., a concrete and

particularized, actual or imminent invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 555 (1992).

In Establishment Clause cases, the injury in fact component of standing presents distinct analytical complexities. *See Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489–90 (2d Cir. 2009) (observing that "there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context" because the Supreme Court has yet to provide "reliable and handy principles of analysis"). Because Establishment Clause plaintiffs are typically driven by their "spiritual, value-laden beliefs" rather than a physical injury or pecuniary loss, *ACLU of Georgia v. Rabun Cnty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1102 (11th Cir. 1983), a concrete injury in fact is "particularly elusive," *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1085 (4th Cir. 1997). Courts, therefore, recognize that an intangible injury such as spiritual harm "may suffice to make an Establishment Clause claim justiciable." *Id.* at 1086. The Supreme Court has observed that parents and their children have a cognizable interest in receiving a public education that comports with the Establishment Clause. *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n. 9 (1963).

Here, Plaintiffs have alleged a personal and direct stake in the pending controversy. Plaintiffs allege injury in that their family "does not wish to encounter unconstitutional school-affiliated prayers included as part of the school's ceremony or to be forced to attend a ceremony held in a sectarian venue, such as a church or chapel, which heightens [their] sense that the school chooses to affiliate itself with Christianity, leaving [them] as outsiders in [their] own public schools." [Doc. 21-1 ¶ 2.] These intangible, spiritual injuries are more

8

than a mere abstract knowledge of unconstitutional conduct and are consistent with the cognizable injuries that typically suffice to give Establishment Clause plaintiffs standing. As enrolled students in the School District, and as parents of enrolled students, Plaintiffs have shown they have a vested spiritual stake in First Amendment values sufficient to give standing to contest the School District's use of the Turner Chapel as a venue for the Elementary School's graduation.  Further, Plaintiffs John and Jane Doe have standing to bring this case regardless of whether their two younger children are parties to this action because they have alleged direct injury as a result of their attending the graduation ceremony in 2013 and having to attend another at the end of this school year.  Accordingly, the Court finds Plaintiffs have standing to bring this action.

**Mootness**

Defendants argue the present issue is moot because Jill Doe has already graduated; therefore, injunctive relief is no longer appropriate.  [Doc. 17 at 5.]  Plaintiffs contend the issue is not moot because John and Jane Doe's claims survive their daughter's graduation; and Jane Doe continues to attend a school within the School District and plans to attend her brothers' graduation ceremonies from the Elementary School. [Doc. 21 at 3.]  The Court agrees that the issue is not moot.

The Constitution limits this Court's jurisdiction to the adjudication of actual cases and controversies. U.S. Const. art. III, § 2, cl. 1; *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  The requirement that a case have an actual, ongoing controversy

9

extends throughout the pendency of the action.  *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).

When students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate.  *E.g.*, *Bd. of Sch. Comm'rs of the City of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam) ("[Once] all of the named plaintiffs in the action had graduated . . . a case or controversy no longer exists."); *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000) (holding that the "case lacks a live controversy [because the plaintiff] has graduated"). Accordingly, graduated students often maintain their claims fall under an exception to the mootness doctrine where the harm is "capable of repetition, yet evading review."  *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam).  In *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam), the Supreme Court stated that "in the absence of a class action, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."  A mere physical or theoretical possibility is not sufficient to satisfy the test stated in *Weinstein*; rather, there "must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party."  *Murphy*, 455 U.S. at 482 (quoting *Weinstein*, 423 U.S. at 149).

Here, the Court finds the exception is clearly applicable.  The challenged action, Jill Doe's graduation ceremony, was too short in duration to be fully litigated prior to its

cessation or expiration.  While it is not completely clear when John and Jane Doe realized the graduation would be at the Turner Chapel and include two student-led prayers, it is reasonable to assume they were informed shortly before the ceremony was to occur.  [Doc. 17-1 ¶ 13 (Affidavit of Jennifer Gibson ("Gibson") stating, "About 10 weeks prior to the 2013 program, I sent a notice to parents regarding the time, place, and student dress code for the ceremony.").]  Further, John and Jill Doe currently have a fifth grader at the Elementary School and, thus,  there is a reasonable expectation the same complaining party would be subjected to the same action again.  Accordingly, the Court finds Defendants' mootness argument without merit.

**Likelihood of Success on the Merits**

An analysis of the *Winter* factors reveals that Plaintiffs have failed to satisfy the elements required for a preliminary injunction to issue because Plaintiffs have failed to demonstrate that they are likely to succeed on the merits.  Plaintiffs brought this motion for preliminary injunction under the Establishment Clause.  Plaintiffs contend they will likely succeed on the merits because "Defendants' practice of including prayers in public school graduations  and  of  holding  such  ceremonies  in  a  sectarian  venue  violates  the Establishment Clause because it affiliates the government with religion" and that "holding graduations in a sectarian religious venue such as the Turner Chapel, adorned with sectarian symbols, is unconstitutional" because it fails the *Lemon* test by lacking a secular purpose, endorsing religion, and creating an excessive entanglement with religion.  [Doc. 5-1 at 5–6, 29–34.]

Defendants argue that "Plaintiffs cannot realistically contend that [the Elementary School's] use of the Turner Chapel was motivated in any respect by religious purposes"

11

in light of the reasons provided before the Court for holding the fifth grade graduations at that venue.  [Doc. 17 at 8–9.]  Defendants assert the Fourth Circuit Court of Appeals has recognized "that displays with religious content—but also with legitimate secular use—may be permissible under the Establishment Clause" when analyzed under the reasonable, objective observer test where the observer is "deemed aware" of the "history and context" underlying the challenged practice.  [*Id*. at 10 (internal quotation marks and citations omitted).]  The Court agrees that Plaintiffs have failed to establish that they are likely to succeed on the merits.

The Establishment Clause limits any governmental effort to promote particular religious views to the detriment of those who hold other religious beliefs or no religious beliefs.  However, "the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion."  *Schempp*, 374 U.S. at 225 *(*quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313 (2000) ("By no means do these commands [of the Religion Clauses] impose a prohibition on all religious activity in our public schools"); *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (stating that religion must be accommodated and that "[a]nything less would require the 'callous indifference' we have said was never intended by the Establishment Clause" (internal citation omitted)).

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court enunciated a three-part test to determine whether government action violates the Establishment Clause.  To satisfy the prohibition against conduct that establishes religion, government action must: (1) have a secular purpose; (2) have as its "primary effect . . . one that neither advances nor inhibits religion"; and (3) "not foster an excessive government entanglement with

12

religion." *Id*. at 612–13 (internal quotation marks omitted).   A majority of the Court has reaffirmed the importance of *Lemon's* "purpose" prong, and concluded that its "effect" and "entanglement" prongs rightly comprise a single inquiry. *See Agostini v. Felton*, 521 U.S. 203 (1997).   The Court will now address the three prongs of the *Lemon* test.[5]

### Prong One: Secular Purpose

Plaintiffs contend Defendants' use of the Turner Chapel as a venue for graduation ceremonies lacks a secular purpose.  [Doc. 5-1 at 31.]  Defendants argue there was "[n]o religious motivation or purpose [] present and the reasons for using the Turner Chapel were entirely secular."  [Doc. 17 at 9.]

The first prong of the *Lemon* test looks at the purpose behind a government action and allows the action to stand if it is not "entirely motivated by religion."  *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003).   "The [secular] purpose prong of the *Lemon* test asks

---

[5]A second test, known as the "endorsement test," was first articulated by Justice O'Connor in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668 (1984), and later adopted by a majority of the Court in *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 592–94 (1989).  Under the endorsement test, the government may not engage in a practice that suggests to the reasonable, informed observer that it is endorsing religion.  *Lynch,* 465 U.S. at 690 (O'Connor, J., concurring).  The endorsement test has been treated as a refinement to the second *Lemon* prong.  *Mellen v. Bunting*, 327 F.3d 355, 370–71 (4th Cir. 2003). Here,however, the Court declines to apply the endorsement test because the Supreme Court has indicated has been abandoned.  *See Town of Greece, N.Y. v. Galloway*, — U.S. —, 134 S. Ct. 1811 (2014).

In *Lee v. Weisman*, the Supreme Court formulated its "coercion test," under which "government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. 577, 587 (1992).  The Fourth Circuit Court of Appeals has recognized that the coercion test "has emerged as a prevailing consideration in the school prayer context," *Mellen*, 327 F.3d at 370; however, here, the issue of school prayer is not in dispute. Further, because the Supreme Court has applied a variety of tests in school prayer cases, federal appellate courts have also followed an inconsistent approach.  *Id.*; *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1478–83 (3d Cir. 1996) (en banc) (separating coercion test from *Lemon* test and applying both).  Accordingly, the Court declines to apply the coercion test in the context of a religious display case.

whether government's actual purpose is to endorse or disapprove of religion." *Lynch*, 465 U.S. at 690 (1984) (O'Connor, J., concurring). A court need not find that the purpose be "exclusively secular." *Id.* at 681 n. 6; *see also Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) (noting that even though a statute may have a religious purpose, it may still satisfy the *Lemon* test if it also has a "clearly secular purpose."). The Fourth Circuit Court of Appeals has held that this first prong is "a fairly low hurdle." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995). Although the government must act with a "clearly secular purpose," it may be "motivated in part by a religious purpose." *Wallace*, 472 U.S. at 56.

To determine the purpose of challenged government action, the proper inquiry focuses on its stated purpose and history. *Edwards v. Aguillard* , 482 U.S. 578, 586–87 (1987). When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is entitled to some deference; however, it is nonetheless the duty of the courts to "distinguis[h] a sham secular purpose from a sincere one." *Wallace*, 472 U.S. at 75; *Edwards*, 482 U.S. at 586–87 (holding that the stated purpose underlying governmental action must be "sincere and not a sham").

Here, Defendants produced the affidavit of Gibson who averred that Turner Chapel was chosen as the venue for the fifth grade graduations because the Elementary School had grown and teachers and parents expressed concern that the cafetorium—the former venue for the ceremony—was too small, cramped, and uncomfortable. [Doc. 17 ¶¶ 2, 6.] She stated that adults were required to sit at tables in elementary-sized chairs and only three members of each fifth grader's family were permitted to attend the ceremony due to

14

space and safety concerns.  [*Id.* ¶¶ 4–5.]  Gibson averred that the fifth grade teachers unanimously believed the Turner Chapel and Music Building at the Christian University, which is approximately 3.1 miles from the school, would be a far better location for the graduation, [*id*. ¶ 7] and that the Turner Chapel can seat approximately 2,000 people; has padded, individual chairs; has raised seating with good sight lines to the stage; and has a professional sound system [*id*. ¶ 8].  She further stated that the additional space would make the ceremony much more comfortable for students and visitors; more parents, siblings, and other relatives would be able to attend the graduation; and the use of the Turner Chapel enhanced the safety of the graduation because conditions were less crowded and ample seating and parking existed.  [*Id.*]

The Court finds that the evidence indicates the School District's purpose for moving the fifth grade graduation ceremony to the Turner Chapel was secular and not motivated by religious purpose.  As Defendants aver, the move to the larger venue was prompted by the growth of the school population and the school's need to accommodate more people in a safe manner.  Plaintiffs present no evidence to challenge the School District's

showing.[6]  Accordingly, the Court finds the School District's use of the Turner Chapel is supported by a pragmatic, legitimate, secular purpose.

### Second Prong: Primary Effect

Plaintiffs contend the use of the Turner Chapel fails the second prong of the *Lemon* test.  [Doc. 5-1 at 32–34.]  Specifically, Plaintiffs argue that holding graduations in a sectarian religious venue such as the Turner Chapel, adorned with sectarian symbols, is unconstitutional under *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840 (7th Cir. 2012) (en banc), *cert. denied*, — U.S. —, 134 S.Ct. 2283 (2014), which held that a school's practice of holding graduations in a church violated the Establishment Clause.  [Doc. 5-1 at 29.] Plaintiffs also contend that, by holding their graduation ceremonies in a church on the campus of the Christian University, Defendants unconstitutionally coerce students to enter a Christian environment.  [*Id*. at 30.]

Defendants argue the proper analysis "is 'whether a particular display, with religious content, would cause a reasonable observer to fairly understand in its particular setting as impermissibly advancing or endorsing religion.'"  [Doc. 17 at 9 (quoting *Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 271 (4th Cir. 2005).]   Further, Defendants argue that "no

---

[6]Plaintiffs contend that it would be possible for the School District to hold its graduation ceremonies in a venue that is free from sectarian or religious iconography, including a gymnasium, auditorium, cafeteria, or football stadium of any public school. [Doc. 1 ¶¶ 31–32.]  Plaintiffs specifically argue the graduation ceremony could be held approximately two miles away at Blue Ridge Middle School in the gymnasium, approximately four miles away at Blue Ridge High School in the gymnasium or  football stadium, or at the Sterling Community Center auditorium.  [*Id.* ¶¶ 34–36.]  However, there is no evidence to support a contention that these alternate venues are available or satisfy Defendants' concerns of space and security.  Additionally, the fact that there may be alternate venues does not establish that the School District's purpose for using the Turner Chapel was religious.

16

reasonable observer would conclude that the school is endorsing the views of [the Christian University] by holding graduations in the Turner Chapel." [Doc. 17 at 10.] The Court agrees with Defendants.

The second prong of the *Lemon* test requires the Court to determine whether the use of the government action has the principal or primary effect of advancing or inhibiting religion. *Koenick v. Felton*, 190 F.3d 259 (4th Cir. 1999); *see also Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995) (holding that governmental action is unconstitutional if its primary effect is to promote religion in general or a particular religious sect). This "primary effect" prong must be assessed objectively, in order to measure whether the principal effect of government action "is to suggest government preference for a particular religious view or for religion in general." *Barghout*, 66 F.3d at 1345. Put differently, "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Wallace*, 472 U.S. at 56 n. 42 (internal quotation marks omitted). The court's charge here is "delicate and fact-sensitive . . . and is of necessity one of line-drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the State." *Lee v. Weisman*, 505 U.S. 577, 597–98 (1992).

Plaintiffs maintain that the Turner Chapel is the site of regular chapel services at the Christian University and it contains eight stained glass windows and a pipe organ. [Doc. 1 ¶ 16.] At the entries way to the Turner Chapel lobby, there are several large doormats prominently featuring the Christian University's slogan, "Christ Makes The Difference," with a Christian cross in the center. [Docs. 57-1 at 1–4; 61-14 ¶ 20.] Surrounding the entire

17

interior of the chapel are eight large stained glass windows of overtly religious Christian scenes, each featuring Jesus Christ.[7]   [Docs. 1 ¶¶ 28–29; 57-3–57-11.]   At the 2013 graduation, there was a Christian cross on a podium that was positioned near the center of the Turner Chapel stage.   [Doc. 1 ¶ 27.]   Numerous signs depicting the Christian University's logo and slogan lined the road leading up to the Turner Chapel.  [Doc. 58-16.]

Defendants, on the other hand, contend that Turner Chapel is a non-traditional sanctuary that has stadium seating like an auditorium rather than church pews and has no religious iconography or any religious materials, banners, or other promotional materials either in the lobby or inside the seating area.  [Docs. 17-1 ¶ 8; 17-5 at 1–6.]  Further, no church members, officials, or employees of the Christian University, or any other individuals affiliated with the Christian University participated in any way or encountered students and their families before, during, or after the graduation ceremony; and any religious iconography at the Turner Chapel was limited to: eight stained glass windows high above the seating area depicting Christian religious scenes, a small Christian University logo containing a cross on the podium on stage, and a small cross on top of a clock on the roof of the building.  [Docs. 17-1 ¶ 12; 17-5 at 1–6.]

In *Elmbrook*, the venue for the graduation ceremony included not only the presence of religious imagery upon driving up to the graduation ceremony location, but also tables in the lobby where the graduates congregated filled with evangelical literature, much of

_____

[7]The first window on the left side depicts the birth of Jesus; the second depicts Jesus preaching to followers; the third appears to be depicting Jesus helping Peter; the fourth depicts Jesus talking to two children; the fifth shows Jesus praying in the garden of Gethsemane; the sixth shows Jesus crucified on a cross; the seventh depicts Jesus having supper with two disciples; and the eighth depicts the resurrection of Jesus.  [Docs. 57-3–57-11.]

which addressed children and teens; religious banners, symbols, and posters; a large circular desk displaying pamphlets directed to young adults, middle school ministry, and high school ministry; church members manning the information booths containing the religious literature; church members passing out literature in the lobby; a large Latin cross hung over the dias at the front of the chapel and dominating the proceedings; bibles and hymnal books in the pews; and donation envelopes. *Elmbrook*, 687 F.3d at 846. The court found the "environment was pervasively Christian, obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church." *Id*. at 853. Key in the court's holding was its finding that the environment was a "pervasively Christian, proselytizing environment." *Id*. at 855. The court in *Elmbrook* was clear, however, that its opinion should not be read as critical of cases permitting governmental use, in the proper context, of certain church-owned facilities. *Id.* at 843.

In this case, religious imagery was easily visible and the overall environment was clearly Christian; however, there was no proselytizing or evangelism by members of the Christian University aimed at forcing Christian beliefs on those entering the Chapel. To the contrary, neither members nor officials of the Christian University were present and there were no allegations that literature directed at the children was visibly displayed. Consequently, with the discontinuation of the student-led prayer, Plaintiffs' allegations of coercion are undermined by the lack of School District involvement in a religious exercise likely to influence religious identity or induce participation. *See Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 406–07 (4th Cir. 2005) ("[A]ll of the cases holding that indirect coercion of religious activity violates the Establishment Clause presuppose that the

19

challenged activity is a *religious exercise*." (emphasis in original)).  Plaintiffs' offense at having to attend graduation ceremonies at the Turner Chapel and face religious symbols, while in no way insignificant, is not enough to establish a constitutional violation.  *See Lee*, 505 U.S. at 597 ("People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation.").  In light of the holding in *Elmbrook*, on which Plaintiffs rely, the Court finds Plaintiffs' allegations fail to establish that the use of the Turner Chapel by Defendants has the primary effect of promoting religion in general or a particular religious sect; and, accordingly, the use of Turner Chapel comports with the second prong of the *Lemon* test.

### Third Prong: Entanglement

Plaintiffs argue the use of Turner Chapel as a graduation venue for the Elementary School fosters unconstitutional entanglement with religion by creating division along religious lines, sending a message that Christian institutions are the preferred partners of the School District and, conversely, that non-Christians are outsiders in their own public schools.  [Doc. 5-1 at 34.]

Defendants argue there is no ongoing relationship between the Elementary School and the Christian University beyond the fewer than four combined hours of fifth grade graduations in 2012 and 2013.  [Doc. 17 at 13.]  Additionally, Defendants contend "[t]here was no participation in the graduation by [the Christian University], and [the Christian University]  had no input, involvement, or control in the planning or implementation of the graduation ceremony."  [*Id.*]  Thus, Defendants assert that Plaintiffs have made no showing

20

of entanglement sufficient to obtain a preliminary injunction.  [*Id.*]  The Court agrees with Defendants.

Under the final prong of the *Lemon* test's final prong, a court must consider whether the government action has created an "excessive entanglement" between government and religion.  *Lemon*, 403 U.S. at 613.  The Supreme Court has held that "[e]ntanglement is a question of kind and degree," *Lynch*, 465 U.S. at 684, and because some interaction between church and state is inevitable, the Supreme Court has reaffirmed that the "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini,* 521 U.S. at 233.

As previously stated, the Elementary School activities at Turner Chapel are controlled by the School District, and the Christian University has no involvement whatsoever in the ceremony and is not present during the ceremony.  Accordingly, the Court fails to find any evidence of entanglement.  Because Plaintiffs have failed to show a likelihood of success on the merits, a preliminary injunction is not appropriate with respect to the use of the Turner Chapel.[8]

---

[8]Because *Winter* requires a plaintiff to establish all four elements to receive injunctive relief and, here, Plaintiffs have failed to demonstrate that they will likely succeed on the merits, the Court declines to address the other *Winter* factors.

**RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Plaintiffs' motion for a preliminary injunction be DENIED with respect to Defendants' use of Turner Chapel as a graduation venue.[9]

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

February 18, 2015
Greenville, South Carolina

---

[9]As previously noted, Defendants have agreed not to include prayer in graduation ceremonies.