IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| American Humanist Association, John Doe and Joe Doe *as parents and next friends of their minor child,* and Jill Doe, | ) ) ) ) ) | Civil Action No.: 6:13-2471-BHH |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER AND OPINION** |
| South Carolina Department of Education and Greenville County School District, | ) ) ) ) | |
| Defendants. | ) ) ) | |

This matter is before the Court on the parties' cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiffs filed a motion for summary judgment, on February 4, 2015, (ECF No. 84) and the Defendant Greenville County School District filed its cross-motion, on March 13, 2015 (ECF No. 89). Both parties responded. (ECF Nos. 92, 93.)

The plaintiffs have challenged two practices of the defendant school district related to its graduation practices, as unconstitutional, and seek to enjoin their continued implementation. First, the plaintiffs contest the defendant's practice, relating to the inclusion of prayer or other religious statement at its graduation ceremonies, as a violation of the Establishment Clause of the First Amendment to the United States Constitution. Second, the plaintiffs contend that the choice of certain schools within the district to use a religious chapel on the campus of North Greenville University is also unconstitutional. The Court has already dismissed the chapel claim by way of separate order. (ECF No. 96.)

## BACKGROUND

Jill Doe is the daughter of Jane and John Doe ("Doe Parents"). Jill was a fifth grade student at Mountain View Elementary School ("MVES"), during the 2012-13 school year. (Verified Compl. ¶ 6.)[1] The Does are professing humanists and non-theists and members of Plaintiff American Humanist Association. *Id.* ¶¶ 8,9. The plaintiffs filed this action against the Greenville County School District to vindicate their rights under the Establishment Clause, seeking declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983. The plaintiffs challenge the constitutionality of the defendants' long-held practice of including prayers at public school graduation ceremonies.

Since 1951, Christian prayers have been included at graduation ceremonies for elementary school children in the school district. (Def. Ans. Interrog. Nos. 3, 4.) All prayers have been delivered by school-selected fifth graders, normally age 10 or 11. *Id.* No. 5. Two prayers are included each ceremony. (See John Doe Decl. Ex. A.) The first is offered after opening remarks by the principal and the second is offered at the ceremony's conclusion. *Id.* It does not appear that any have been non-Christian prayers. (See Def. Ans. American Humanist Association (AHA) Interrog. Nos. 8.) It has been the school district's practice to have school officials, typically fifth grade teachers, select the students to deliver the prayers. *Id.* No. 9. Students are selected based in part on their "ability to speak in front of a group." *Id.* It has also been the school district's practice to have school officials review and approve the content of the prayers prior to their delivery. *Id.* No. 10. Each prayer is designated as "Prayer" on the official graduation programs, which are

---

[1] Respectfully and for guidance with future filings, citation in the plaintiffs' memorandum to the paragraph enumeration in the undisputed statement of facts, rather than to the evidence itself, has not well assisted the court in identifying the evidence or translating its own citations herein.

2

distributed to attendees, such as the Does. (John Doe Decl. Ex. A.)

On May 30, 2013, the school district conducted its annual MVES graduation and included two Christian prayers as part of the ceremony. (Gibson HFF. ¶ 11; Jill Doe Decl. ¶ 3; John Doe Decl. ¶ 5.) Jill participated in the event, and her parents attended. *Id.* At the 2013 ceremony, the first prayer directly followed the "Welcome" by "Ms. Gibson." (John Doe Decl. Ex. A.) Prior to the ceremony, a school official asked one student to write and deliver the first prayer and another to write and deliver the closing prayer. (Verified Compl. ¶ 44.) Each prayer was then reviewed by, and approved by, a teacher. *Id.* ¶ 52-54. During the ceremony, Jill Doe saw her peers bowing their heads during the prayers. (Jill Doe Decl. ¶ 3.) Although praying is against Jill's sincerely held convictions, Jill bowed her head too. *Id.* She was afraid she would be in trouble if she did not participate in the prayer and also did not want to stand out amongst her peers. *Id.* The Doe Parents witnessed most, if not everyone, bowing their head for the prayers, including their daughter. (John Doe Decl. ¶ 5; Jane Doe Decl. ¶ 6.) The Doe Parents raised Jill as a non-theist and felt their daughter was coerced into participating in the prayer. *Id.*

Other schools in the district, including elementary schools, have a policy and practice of including prayers in graduation ceremonies. (John Doe Decl. Ex B at 1-8; Def. Ans. Req. Admit at 1.) It is undisputed that in the vast majority of these schools, the prayer-givers are selected by the school, as with MVES, often based on ability to publicly speak, class rank, or class office. (See generally Def. Ans. Doe Intercoms.) It is further undisputed that in most of these schools, the "prayer" (or "invocation" and "benediction") has been listed on the official graduation program handed out to attendees and that, in many of these programs, the audience and graduates are expressly instructed to stand for

3

the prayer. *Id*. In several schools, men are even required to remove their caps. *Id*.

The defendant, however, has now amended its position on prayer and religious content at graduation:

> As it pertains to the use of prayer by students, the District is committed to not endorsing the use of such prayer by students, and therefore, any prayer given by a student at a school-sponsored event, including an awards program for Mountain View Elementary, will be under different circumstances than the May 30, 2013 program . . . . With regard to a student delivering a prayer or providing a religious message during a school sponsored event, the District will not prohibit this practice as long as the prayer or message is student led and initiated and does not create a disturbance to the event. Prohibiting such independent student speech would go beyond showing neutrality toward religion but instead demonstrate an impermissible hostility toward religion. If a student is selected to speak based upon genuinely neutral criteria such as class rank or academic merit, that student should have the same ability to decide to deliver a religious message or prayer as another student has the ability to decide to speak about an inspirational secular book or role model.

(Compl. Ex. 6.) The plaintiffs challenge both the prior practice, and the new amended one, as unconstitutional.

4

## DISCUSSION

To the undersigned there is no more sacred liberty than an individual's personal view of his or her cosmological origin – divine or chance, intentional or naturally selective. And, cultures have developed various names for the posture we assume in the direction of our creative source, most notably, prayer. But, also meditation and pilgrimage. Namaste. Surfing. Fly fishing. Science. The citizens of this country have the privilege of electing between the innumerable alternatives in religious practice. Our constitution has established but one caveat: "The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be *either* proscribed or prescribed by the State." *Lee v. Weisman*, 505 U.S. 577, 589 (1992) (emphasis added). The Court's obligation is in law. The United States Supreme Court has interpreted the protections and liberties of the United States Constitution. And, the Court's job, here, is to make accurate application of them and no more. The Court would not want its editorializing to ever confuse that truth. But, at the same time, the Court would emphasize that its crunching of the clinical legal numbers, so to speak, is at base a very human enterprise to guard the individual freedom of all – to worship and not.

The Christian community, in certain parts, feels besieged. This sense has two sources. The first is the view that people of faith cannot practice their religion and its tenets as they wish. The second is a genuine compassion for this country -- that it know a redeeming faith. To certain parts of Western Christianity, the lack of prayer in the public sector is not only a symptom of declining religiosity and moralism but is, in part, the cause itself.

In contrast, those of different faith or no religious faith at all are exhausted of this

5

historical conflation of judeo-christianism and public ceremony persistent even to now and our exceedingly modern and pluralistic times.  Those that oppose religious practice in schools are exasperated.

The Court has sympathy for both views, indeed, relates.  But, the undersigned's most overwhelming rhetorical reaction to all of this is how in 2015 is there still any debate or legal nuance to hash over prayers at graduation?  One side insists on securing every slight remaining loophole of religious demonstration in school and the other is chasing to the ends of the earth the last pitiful vestiges of these practices that have been essentially neutered of all possible eternal meaning and effect.  This case, of course, is serious and its prosecution and defense justified.  But, litigation is expensive in dollars and time and the fruit of ceaseless advocacy has apparently not been peace.  The two sides find themselves here again and again.  That, of course, is their right.  It is conceivable, however, that, in this war over the private conscious made public, the better strategy is arms laid down in recognition of the human psychology that we are always made more in our submission than our entitlement.

This case will not be the last of its kind.  But, it is the one most immediately important to the people of our community and school system on the issue of prayer at graduation.  The Court would find the following.

The First Amendment of the United States Constitution reads, in relevant part, as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . .

U.S. Const. amend. I.  The Amendment's first clause is styled, Establishment, and its, second, Free Exercise. The plaintiffs seek to enjoin prayer at any future graduations in the

school district as violative of the First Amendment's Establishment Clause.

Specifically, the plaintiffs request the following injunction:

> Defendants, their successors and any person in active concert with the Defendants from knowingly, intentionally, or negligently allowing: (i) prayers to be delivered as part of any school-sponsored event, including but not limited to graduation ceremonies . . . .

(Verified Compl. at 10.)

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006). A plaintiff must demonstrate: (1) that she has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The standard for a permanent injunction is "essentially the same" as for preliminary injunctive relief, with the exception that the plaintiff must show actual success on the merits. *See Amoco Prod. Co. v. Vill. of Gambell*, AK, 480 U.S. 531, 546 n.12 (1987). "The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995).

To the extent the plaintiffs seek to enjoin the kind of official and school-sponsored student prayers, which were held as a formal part of graduations in the school district in 2013 and prior, the injunction is granted. The defendant concedes that such formal and sponsored prayers are unconstitutional and should no longer be allowed. (Def. Mem. Supp. Summ. J. at 6-7.) It admits:

> Prior to and following the 2013 program, the School District has taken steps to prevent official, school sponsored prayers from

7

> being made part of end-of-year programs.  Any future fifth
> grade end-of-year programs at MVES, or other schools, will not
> include such prayers. (Gibson Aff. ¶ 17.)

(Def. Mem. Supp. Summ. J. at 7.)

As already quoted, the defendant instead has taken a new position concerning

religious content at graduations:

> As it pertains to the use of prayer by students, the District is
> committed to not endorsing the use of such prayer by students,
> and therefore, any prayer given by a student at a
> school-sponsored event, including an awards program for
> Mountain View Elementary, will be under different
> circumstances than the May 30, 2013 program . . . . With
> regard to a student delivering a prayer or providing a religious
> message during a school sponsored event, the District will not
> prohibit this practice as long as the prayer or message is
> student led and initiated and does not create a disturbance to
> the event.  Prohibiting such independent student speech would
> go beyond showing neutrality toward religion but instead
> demonstrate an impermissible hostility toward religion. If a
> student is selected to speak based upon genuinely neutral
> criteria such as class rank or academic merit, that student
> should have the same ability to decide to deliver a religious
> message or prayer as another student has the ability to decide
> to speak about an inspirational secular book or role model.

(Compl. Ex. 6.)

As the plaintiffs contend, this modified position, does not end the inquiry.  Ordinarily,

the defendant's voluntary cessation of a challenged practice will not moot an action

because "the defendant is free to return to his old ways."  *United States v. W.T. Grant Co.*,

345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Jager v. Douglas Cnty. Sch.*

*Dist.*, 862 F.2d 824, 833 (11th Cir. 1989).  The Supreme Court and Fourth Circuit rulings

make clear that "the mere passage of a resolution . . . cannot immunize the body from

constitutional challenge where its actual practice fails to meet the standard set forth in its

resolution."  *Doe v. Pittsylvania Cnty.*, 842 F. Supp. 2d 906, 926 (W.D. Va. 2012); *see also*

8

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) ("The District, nevertheless, asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly -- that this policy is about prayer . . . We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer."); *Joyner v. Forsyth County, N.C.*, 653 F.3d 341, 348, 354 (4th Cir. 2011) ("[o]ur cases have . . . approv[ed] legislative prayer only when it is nonsectarian in both policy and practice" because "citizens attending Board meetings hear the prayers, not the policy.") (emphasis added). Stated differently, even if the School District's policy is facially neutral, "[the Court] cannot turn a blind eye to the practical effects of the invocations." *Id.* at 354.

And, the Court is adamant to look beyond the face of the defendant's stated position to its likely and practical effects at district graduations. Indeed, precisely because of the historical inclusion of prayer and religious speech at graduations, in this school district and State, it is conceivable that the cultural residue of prior practices might continue to color and confuse the application and invitation of, even now, constitutionally neutral practices. The undersigned is vigilant to identify any kind of wink and nod maneuvering.

But, the plaintiffs now have a serious kind of evidentiary problem. The impropriety of the old practice having been entirely confessed, the majority of the plaintiffs' legal precedent and factual history are neutralized. The defendant's new position involves no selection process, or election, to preemptively challenge or question. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Am. Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1478 (3d Cir. 1996); *Gearon v. Loudoun Cnty. Sch. Bd.*, 844 F. Supp. 1097, 1099 (E.D. Va. 1993). There is no proposed prior approval

or vetting of any prayer.  Invocation is not an itemized and scheduled element of any graduation.  There is no anticipated preference shown to speakers based upon content or belief.  *See Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Schs.*, 373 F.3d 589, 598 n.5 (4th Cir. 2004).  And, there is not, as of yet, any serious evidentiary basis to expect that students speaking at graduation will enter into prayer or speak religiously in a way that implies school sponsorship.  *See, e.g., Doe v. Madison Sch. Dist. No.,* 321, 147 F.3d 832, 834 (9th Cir. 1998), *vacated for lack of standing*, 177 F.3d 789 (9th Cir. 1999) (en banc).  In all of the precedent emphasized by the plaintiffs, there existed still, even upon reformed policy, active state participation.

*Joyner* is illustrative.  The Forsyth County Board of Commissioners had a policy of making open, written invitation to County clergy of all faiths, on a first-come, first-serve basis, to begin Board meetings in prayer.  *Joyner*, 653 F.3d at 343.  It sent them letters. *Id.*  The Board did not vet the prayer content and emphasized that it should be non-evangelical and ecumenically respectful.  *Id.*  In response to a constitutional challenge, the practice was made more formally codified and disallowed inclusion of the invocation on the meeting's agenda – in a sense, less sponsored.  *Id. Joyner* is representative of the variety of cases the plaintiff would analogize in claiming that facially neutral and passive prayer policies are still unconstitutional.  It is indeed probably the closest analog to the present case on this particular point.[2]  But, even here there are two important distinctions.

First, the State in *Joyner*, as in all such proffered cases by the plaintiff, remained

_____

[2] *Joyner* concerns legislative prayer, which is viewed through a different historical lens.  The Court means only to rejoin the plaintiff's reliance on it, and others, for some idea that it suggests that neutral policies, still permissive of prayer, are always unconstitutional.  The policy in Joyner was not *neutral.*  In policy and practice, it involved active sponsorship of the State.  The defendant's amended practice here anticipates no such continuing activity.

*active* – active to invite area clergy if even under the guise of non-sectarian and voluntary participation. And, although not a memorialized part of the physically prepared agenda, the Board meeting allotted specific time at the beginning for such prayers and asked the audience to stand in its recognition. *Id.* at 344. The policy, in law and fact, was not passive.

Second, the Fourth Circuit recognized that the policy in practice consistently invited prayer that was Christian in quality. There was specific evidence in the record that whatever neutrality had been attempted on paper had been plainly undermined in application. *Id.* at 354.

The new position of the defendant, here, is both neutral and passive. On its face, it does not invite any prayer or speech, sectarian or otherwise; it cannot be said to be coercive. It prescribes nothing.[3] There is nothing about the new position on graduations that suggests any role whatsoever in the schools attempting to make space available for invocation. There is certainly no process or mechanism associated with any prayer as in the numerous case examples above. As far as the Court can tell, no policy or position, as neutral and passive as the one at issue in this case, has ever been struck down. The plaintiffs would cite *Santa Fe Indep. Sch. Dist. v. Doe* as the United States Supreme Court's teaching on "purportedly neutral, hands-off" prayer policies. The plaintiffs contend that the Supreme Court found that "the simple enactment of this policy . . . was a constitutional violation." *Santa Fe*, 530 U.S. at 316. It stressed: "We need not wait for the

---

[3] Although some matter of semantics, it is no policy at all, as the defendants correct. It is a response to activity not even yet occurring – what the defendant will not do. In that sense, there is not even any state act in the non-proscribing, itself. It is as neutral and non-acting as the defendants can be and still be acting sufficient to ensure others, and this Court, they will behave constitutionally.

inevitable to confirm and magnify the constitutional injury." *Id*. Thus, the Court concluded, "even if no Santa Fe High School student were ever to offer a religious message, the [new] policy fails."[4] *Id*. Certainly, the plaintiffs have standing to challenge the alleged neutrality of the present policy, as in *Santa Fe,* and the Court must consider the concern. But, the policy in *Santa Fe*, on its face, was far from passive. The graduation and "Prayer at Football Games" policies involved school-endorsed and school-prescribed election processes, which had the sole purpose of deciding on both the inclusion of prayer and the individual praying. *See Adler v. Duval Cnty. Sch. Bd.*, 250 F.3d 1330, 1337 (11th Cir. 2001). *The school district, itself, established a process that invited the conversation and decision over inclusion of prayer at an official school function*. What is continuously confused by the proponents of prayer in school or public forum is that these affirmative attempts to invite or measure the "voluntary choice" of students to pray, in the very same moment, renders that choice less than wholly voluntary. The very act of raising the issue alters the degree of its voluntariness. It is like the *Observer Effect*.[5] In the moment we measure it, it is changed. So, when the decisions talk of private speech, in this perilous

---

[4] Footnote 21 of *Santa Fe* reads in part, "Even if the plain language of the October policy were facially neutral, 'the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'" *Santa Fe*, 530 U.S. at 308 n. 21 (citation omitted). This comment simply reiterates a legal point inapplicable here. It is unconstitutional to establish religion in the public sphere, even where the state claims, in policy, that it will not. But, such is not the present case. There is no significant pattern of behavior inconsistent with the new position, for the plaintiff to contest or to justify the anticipation of more. The Court will discuss the evidence of schools not adhering to the new position, in 2014. Regardless, if the school district does return to old ways over the injunction of this Order, sanction and damage will be forthcoming.

[5] In science, the term "observer effect" refers to changes that the act of observation will make on a phenomenon being observed. The undersigned originally believed the Heisenberg Uncertainty Principle was emblematic. But, according to the crowd-sourcing inerrancy of Wikipedia, apparently that axiom has been frequently confused with the observer effect, even by its originator, Werner Heisenberg, evidently. The Court has good company, therefore.

hybrid of public ceremony conducted by actual individuals and citizens, the expectation, if it means anything, is that the religiosity, if any at all, must spring forth from the imagination solely of the speaker and not as the result of expectations and pressures attributable, or historic, to, state action in the graduation or event itself.  Moved in the spirit, so to speak.

The plaintiffs are wrong to cite *Joyner* and *Santa Fe* as against the kind of position, at issue here, which simply refuses to preemptively restrain a certain type of message, namely religious.  That is to invite a wholly new constitutional problem.  "[T]he Supreme Court has never held that the mere fact that private religious speech occurs during school hours is sufficient to render it state speech."  *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 282 (4th Cir. 1998).  The Supreme Court has expressly acknowledged that "not every message delivered under such circumstances is the government's own."  *Santa Fe*, 530 U.S. at 302.  "What turns private speech into state speech in this context is, above all, the additional element of state control over the content of the message."  *Adler,* 250 F.3d at 1341.  Indeed, and to reiterate, an affirmative exclusion of religious viewpoints is an equal violation.  It is protected speech.

Both, of *Joyner* and *Santa Fe,* involve a kind of "permission" and "authorization" not present at all in this case.  Equally, in *Jager v. Douglas Cnty. Sch. Dist.,* 862 F.2d 824 (11th Cir. 1989), relied on by the plaintiffs emphatically, the policy at issue was an "equal access plan" that expressly "retain[ed] some religious content," by *consent and permission* of the school district.  *Id.* at 826.  The school district was enabling – in other words, entangling.  These cases do not stand for the proposition that religious content must be outlawed

13

afore.[6] That is what the plaintiffs request. It is too far.

The plaintiffs have offered evidence that two high school students chose to give a religiously-themed welcome or closing during the 2014 graduation season. There is also evidence that East North Street Elementary School included prayer in its 2014 program. (Def. Ans. Doe Interrog. No. 2; Def. Resp. Req. Prod. at DEFS 91-92.) The student prayer-givers were chosen by the school "on the basis of grades and ability to speak publicly in front of a group." *Id*. The official program for the 2014 graduation ceremony included an "invocation." (Def. Resp. Req. Prod. at DEFS 91-92.) Likewise, the 2014 Blue Ridge High School graduation ceremony included a closing prayer by the senior class vice president. The official program for the 2014 ceremony directed the audience to stand for the "closing remarks" which was a Christian prayer. (Def. Resp. Req. Prod. at DEFS 131-32.) BRHS graduation speakers are selected by the school. (Def. Ans. Doe Interrog. No. 6.) The 2014 prayer was consistent with prior years; BRHS's 2012 and 2013 graduations included overtly Christian opening and closing prayers. (Def. Resp. Req. Prod. at DEFS

---

[6] The plaintiffs' recourse to *Gearon v. Loudoun Cnty. Sch. Bd.*, 844 F. Supp. 1097, 1099 (E.D. Va. 1993) does not change the Court's view. First, that decision does not contain a sufficient description of the underlying facts and policy for the undersigned to measure the degree of state involvement at issue, there, relative to the facts of this case, here. Second, even still, *Gearon* is not so apparently inconsistent with this Court's own view that "supervision" and "control" are touchstones. And that pressure to stand participatorily at a graduation in prayer or other religious rite is inherently violative. But, the undersigned would simply disagree with *Gearon*, if it means to say that all conceivable prayer is impermissible at graduation even if, hypothetically, a student spontaneously decided to end her speech, without invitation to others to participate, by innocently saying, "God, thank you for helping me complete my remarks." It may be awkward. It may be uncomfortable. It may be ill advised. It may be unlikely. It is not unconstitutional. "So long as the prayer is genuinely student-initiated, and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected." *Chandler v. James*, 230 F.3d 1313, 1317 (11th Cir. 2000). So to the extent *Gearon* suggests, or the plaintiffs ask, that the Court enjoin the defendants so comprehensibly as to eliminate all incidents of religious prayer and expression, humbly, they are off mark. *See Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 612 (8th Cir. 2003) (involving a recitation of the Lord's Prayer at graduation). More will be said in this respect *infra*.

131-32.)

Wade Hampton High School also included a prayer in its 2014 graduation ceremony, as it had in prior years. (Def. Resp. Req. Prod. at DEFS 189-90.) The official program for the 2014 ceremony instructed the audience to stand for the "inspirational reading" which was a prayer, and it appears the defendants knew in advance that a prayer would be delivered. *Id.* No school official, school employee, or student has ever been disciplined or reprimanded in any way by the school district due to prayers that have occurred as part of graduation ceremonies at any school since 2012. (Def. Rev. Ans. Req. Adm. No. 56.)

These three incidents, however, are not representative of the kind of ratio that suggests unconstitutionality in practice. *See Adler v. Duval County School Bd.*, 206 F.3d 1070, 1083 (11th Cir. 200) (*Adler I*) ("While ten of the graduation messages delivered pursuant to the policy involved some sort of religious content, the other seven Duval County graduations either had no student message or a wholly secular message.") *vacated by* 531 U.S. 801 (2000) *and reinstated by* 250 F.3d 1330, 1341 (11th Cir. 2001) (*Adler II*). Moreover, these occurrences are incident to the prior policy, whose application is enjoined by agreement and judicial order. No formal or sponsored "invocation" or "inspirational reading" is allowed under the new policy or the prospective instruction of this Order. This Order will be operative against it.

The Court has presaged the ultimate result but would apply the controlling test, expressly. The religion clauses of the First Amendment require that states "pursue a course of complete neutrality toward religion." *Wallace v. Jaffree*, 472 U.S. 38, 60 (1985). To determine whether state action embodies the neutrality that comports with the Establishment Clause, the Court must apply a three-pronged analysis. *See Lemon v.*

*Kurtzman*, 403 U.S. 602, 612–13 (1971). The undersigned must ask whether (1) the defendant had a secular purpose for adopting its present position on prayer at District graduations; (2) the position's primary effect is one that neither advances nor inhibits religion; and (3) the position does not result in an excessive entanglement of government with religion. *Id.* at 612–13. State action violates the Establishment Clause if it fails to meet any of these three criteria. *See Edwards v. Aguillard*, 482 U.S. 578 (1987).

### Secular Purpose

The first prong of the *Lemon* test asks whether the challenged practice had a secular purpose. "In applying the purpose test, it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" *Jaffree*, 472 U.S. at 56 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). As the Court has already discussed, the defendant's position on religious content at graduations straddles this precarious constitutional fence with near perfect symmetry. It does not endorse and yet stops just nigh of disavowal, the step, further, the plaintiffs beg. The purpose of the current position is secular insofar as it governs a civil ceremony in graduation and protects the fullest liberties in speech for its participants. It is not any endorsement. It is a distancing.

### The Primary Effect

The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Jaffree*, 472 U.S. at 56 n. 42 (quoting Lynch, 465 U.S. at 690 (O'Connor, J., concurring)). As stated, there is no evidence that the position actually works a message of endorsement. The *de minimis* incidents of religious messaging in 2014 do not say

16

otherwise. And, as discussed, this Order is effective to enjoin all such future practices. The new position, however, is so finely weighted, in balance, that literally the only additional protection would be complete proscription of all religious comment, which is impermissible as stated. This is not *Joyner*.

*Entanglement*

The defendant is not entangled with religion at all. The position requires and expects no involvement of the schools in any decision of any individual student to include any religious point of view. *See Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 612 (8th Cir. 2003) ("The complete absence of any involvement by the School District in determining whether Scheer would deliver a speech as well as the complete autonomy afforded to Scheer in determining the content of his remarks indicates a lack of state-sponsorship of his recitation."). Unlike all other relevant precedents cited, there is no process, election, invitation, facilitation, encouragement, formality, influence, or plan. It is a non-plan and a poor cheerleader. In *Santa Fe*, (1) the speech was "subject to particular regulations that confine the content and topic of the student's message," *Santa Fe*, 530 U.S. at 303; and (2) the policy, "by its terms, invites and encourages religious messages," *id.* at 306 (emphasis added). "Those two dispositive facts are not present here, and that makes all the difference." *See Adler II*, 250 F.3d at 1336. There is no state meddling.

The Court would accept the defendant's invitation to heed the Eleventh Circuit's pre- and post-S*anta Fe* decisions in *Chandler v. James*. "Because genuinely student-initiated religious speech is private speech endorsing religion, it is fully protected by both the Free Exercise and Free Speech Clauses of the Constitution." *Chandler v. James*, 180 F.3d 1254, 1261 (11th Cir. 1999) ("Chandler I"), *vacated by Chandler v. Siegelman*, 530 U.S.

1256 (2000) *and opinion reinstated*, 230 F.3d 1313 (11th Cir. 2000) ("Chandler II"). "So long as the prayer is genuinely student-initiated, and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected." *Chandler II*, 230 F.3d at 1317.

In *Chandler II*, the Eleventh Circuit invalidated as overbroad and unconstitutional a district court injunction that prohibited the school district from permitting any prayer in a public context at a school function, as the plaintiffs solicit here. According to the Eleventh Circuit, it was erroneous to equate any and all student speech in a public context to government sponsored speech. As the *Chandler II* court noted:

> Private speech endorsing religion is constitutionally protected—even in school. Such speech is not the school's speech even though it may occur in the school. Such speech is not unconstitutionally coercive even though it may occur before non-believer students . . . . The injunction also forbids the school district from "permitting" students to speak religiously in any sort of public context. This it cannot constitutionally do. The Permanent Injunction may neither prohibit genuinely student-initiated religious speech, nor apply restrictions on the time, place, and manner of that speech which exceed those placed on students' secular speech.

*Id.*

The defendant's position is entirely consistent with the Supreme Court's and Fourth Circuit's declarations that: "There is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Santa Fe*, 530 U.S. at 302 (quoting *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (opinion of O'Connor, J.)). "[G]overnment may not bar religious perspectives on otherwise permitted subjects, as it constitutes viewpoint discrimination to permit 'the presentation of all views . . . except those dealing with the subject matter from a religious

18

standpoint.'" *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006) (citing *Lamb's Chapel v. Center Morches Union Free School Dist*, 508 U.S. 384, 393 (1993)).

The position of the defendant has no religious purpose or effect and does not improperly entangle the State with religion. Indeed, the new position gets the defendant out of that business entirely. And, yet it preserves the constitutional edicts of speech and free exercise for individual students. The words could be rearranged but not to any better effect.

This Court sits in one of the great parts of the world, in people and heritage. There are many in our city and county and State who are the inheritance of a meaningful practice of various religion, maybe Christianity most predominately. Their tenets and freedom to live them matter. But, there is a new and growing richness of population, here, in culture and background, that is transforming the complexion of mores and discourse and daily experience, in both public and private ways. The new practice of the defendant is constitutional. But, plaintiffs are affirmed. Not in their full request for legal remedy but in their aspiration for equal liberty. For too long school districts have cleverly resisted, with every manner of contortion, the force of Establishment jurisprudence to justifiably eliminate all state-sponsored rite. At least one has gotten it exactly right.

Concomitant to the effectiveness of the defendant's new practice is the need that it be effectively communicated. The legacy of the historic inclusion of such prayers at graduation might still be coercively operative on contributing students. The 2014 incidents discussed, *supra*, are evidence that there is some inertia to the practice. Without affirmative instruction that prayer and religious messaging are no longer required, there is

19

some risk that a student may yet still feel compelled.  The defendant school district must, therefore, reasonably publicize the new practice to students participating in any graduations.  Here, unlike with the Observer Effect, discussed previously, the engagement is reinforcing the balance of legal rights rather than affirmatively creating the opportunity to include religious speech through election or otherwise.  It is intended to reset neutrality. The Court does not desire that this affirmative obligation of notice either invite religious content where none was planned or provide cover for school officials to use such a conversation to veil encouragement for praying.  It should be done with those concerns in mind.

The plaintiffs argue, however, that they are still clearly entitled to summary judgment on their claims for nominal damages based on the policies in place at Jill Doe's graduation. As stated, the defendants do not deny that the practice in place, from 1951 through the 2013 MVES graduation, was unconstitutional.  And, nominal damages cannot be mooted. *See Rendelman v. Rouse*, 569 F.3d 182, 187 (4th Cir. 2009).  Once it is shown that a plaintiff's constitutional rights were violated, a court has no discretion to deny nominal damages. *Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007); *Henson v. Honor Committee of U. Va.*, 719 F.2d 69, 72 n.5 (4th Cir. 1983).  The defendants do not contest this demand. They will be granted, therefore, in the amount of $1.

## **CONCLUSION**

Accordingly, the plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.  Specifically, the plaintiffs' motion is GRANTED as to the practice of graduation prayers from 1951 through the 2013 MVES graduation.  That prior practice is hereby enjoined, with the concession of the defendant.  The defendant's new position on prayer at graduations, recited herein, however, is not enjoined, and the plaintiff's motion, as to it, is DENIED.  The defendant's motion for summary judgment is, likewise, GRANTED in part and DENIED in part but conversely so.  It is DENIED as to the prior policy and GRANTED as to the constitutionality of the new.  The plaintiffs are entitled to nominal damages in the amount of $1.

IT IS SO ORDERED.

s/Bruce Howe Hendricks
United States District Judge

May 18, 2015
Greenville, South Carolina